# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: National Hockey League Players' Concussion Injury Litigation | MDL No. 14-2551 (SRN) |
| | **MEMORANDUM OPINION AND ORDER** |

Charles S. Zimmerman and Brian Gudmundson, Zimmerman Reed, PLLP, 1100 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota 55402, for Plaintiffs.

Stephen G. Grygiel and William Sinclair, Silverman, Thompson, Slutkin & White, LLC, 201 North Charles Street, Suite 2600, Baltimore, Maryland 21201, for Plaintiffs.

Jeffrey D. Bores and Bryan L. Bleichner, Chestnut Cambronne PA, 17 Washington Avenue North, Suite 300, Minneapolis, Minnesota 55401, for Plaintiffs.

Stuart Davidson and Mark J. Dearman, Robbins, Geller, Rudman & Dowd, LLP, 120 East Palmetto Park Road, Boca Raton, Florida 33432, for Plaintiffs.

Lewis A. Remele and Jeffrey D. Klobucar, Bassford Remele, 33 South Sixth Street, Minneapolis, Minnesota 55402, for Plaintiffs.

Thomas Demetrio, William T. Gibbs, Corboy & Demetrio, 33 North Dearborn Street, Chicago, Illinois 60602, for Plaintiffs.

Brian D. Penny and Mark S. Goldman, Goldman, Scarlato & Penny PC, 101 East Lancaster Avenue, Suite 204, Wayne, Pennsylvania 19087, for Plaintiffs.

Vincent J. Esades and James W. Anderson, Heins Mills & Olson, PLC, 310 Clifton Avenue, Minneapolis, Minnesota 55403, for Plaintiffs.

David I. Levine, The Levine Law Firm P.C., 1804 Intracoastal Drive, Fort Lauderdale, Florida 33305, for Plaintiffs.

Daniel E. Gustafson, Gustafson Gluek, PLLC, 120 South Sixth Street, Suite 2600, Minneapolis, Minnesota 55402, for Plaintiffs.

Thomas J. Byrne and Mel Owens, Namanny, Byrne, & Owens, APC, 2 South Pointe Drive, Lake Forest, California 92630, for Plaintiffs.

Michael R. Cashman and Richard M. Hagstrom, Zelle Hofmann Voelbel & Mason LLP, 500 South Washington Avenue, Suite 4000, Minneapolis, Minnesota 55415, for Plaintiffs.

Daniel J. Connolly, Joseph M. Price, Linda S. Svitak, and Aaron D. Van Oort, Faegre Baker Daniels, LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402; John H. Beisner and Jessica D. Miller, Skadden, Arps, Slate, Meagher & Flom LLP, 1440 New York Avenue, Northwest, Washington, D.C. 20005-2111; Shepard Goldfein, James A. Keyte, Matthew M. Martino, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036; James Baumgarten and Adam M. Lupion, Proskauer Rose LLP, Eleven Times Square, New York, New York 10036, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

## I.     INTRODUCTION

This matter is before the Court on Defendant National Hockey League's Motion to Dismiss Master Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) [Doc. No. 43].  For the reasons set forth below, the Court denies in part, and denies without prejudice in part, Defendant's Motion.

## II.     BACKGROUND

This litigation was initiated by former National Hockey League players who allege that Defendant National Hockey League (the "NHL") is responsible for "the pathological and debilitating effects of brain injuries caused by concussive and sub-concussive impacts sustained . . . during their professional careers."  (Pl.'s Master Administrative Long-Form and Class Action Compl. [Doc. No. 28] ("Master Compl.") ¶ 1.)  The six named Plaintiffs—who seek to represent a class of living and deceased former NHL players who suffered concussions or repeated sub-concussive injuries while playing in the NHL—are Dan

2

LaCouture, Michael Peluso, Gary Leeman, Bernie Nicholls, David Christian, and Reed Larson.  (See id. ¶¶ 26–83, 387.)  Mr. LaCouture played in the NHL from 1998 through 2008 and suffered roughly twenty concussions and numerous sub-concussive injuries.  (Id. ¶¶ 27–28.)  Mr. Peluso played in the NHL from 1989 through 1998 and suffered at least five concussions.  (Id. ¶¶ 40–41.)  Mr. Leeman played in the NHL from 1983 through 1996 and suffered numerous concussions and sub-concussive hits to the head.  (Id. ¶¶ 52, 54.)  Mr. Nichols played in the NHL from 1982 through 1999 and suffered at least three concussions and numerous sub-concussive hits to the head.  (Id. ¶¶ 59–60.)  Mr. Christian played in the NHL from 1979 through 1994 and suffered numerous concussions and sub-concussive hits to the head.  (Id. ¶¶ 67, 69.)  And, Mr. Larson played for the NHL from 1977 through 1989 and suffered numerous concussions and sub-concussive hits to the head.  (Id. ¶¶ 74, 76.)  These Plaintiffs filed complaints against the NHL in 2014 in the U.S. District Court for the District of Columbia, the U.S. District Court for the District of Minnesota, and the U.S. District Court for the Southern District of New York.  (Transfer Order [Doc. No. 1] at Schedule A.)  Those lawsuits were transferred to this Court for purposes of conducting coordinated and consolidated pretrial proceedings.  (Transfer Order at 1–2.)  Thereafter, these Plaintiffs filed a 454-paragraph Master Administrative Long-Form and Class Action Complaint ("Master Complaint"), which is the subject of the pending Motion.

As defined in the Master Complaint, a "concussion" or "mild traumatic brain injury" ("MTBI"), "consists of trauma to the head and a resulting transient loss of normal brain function."  (Master Compl. ¶ 163.)  According to Plaintiffs, repeated MTBI can

trigger progressive degeneration of brain tissue and can lead to Alzheimer's disease,

dementia, and chronic traumatic encephalopathy ("CTE") (a disease caused by the

accumulation of a toxic protein in the brain).  (See id. ¶¶ 170–74.)  In fact, Plaintiffs

claim, "scientific evidence has for decades linked head trauma to long-term neurological

problems."  (Id. ¶ 3; see id. ¶ 178.)

Over the course of almost 40 paragraphs, Plaintiffs detail various medical and

scientific studies and literature dating back to 1928 that relate to "sports and

concussion[s]" and purportedly "firmly establish[] that repetitive and violent jarring of

the head or impact to the head can cause MTBI with a heightened risk of long term,

chronic neurocognitive sequelae."  (Id. ¶ 160; see id. ¶¶ 179–213.)  Plaintiffs also assert

that, since 2001, there have been four international symposia related to concussions in

sports (which included reports specific to hockey and which were attended by NHL

representatives), as well as multiple conferences in the United States that have focused on

concussions in hockey.  (See id. ¶¶ 225–35.)  According to Plaintiffs, "[i]t is not plausible

that the NHL was unaware of this body of literature."  (Id. ¶ 221.)

In addition to the medical and scientific information of which Plaintiffs claim the

NHL had knowledge or should have had knowledge, Plaintiffs assert that the NHL also

had actual knowledge of the "negative repercussions of [violent head] impacts on its

players" because of the "infamous incidents" that have occurred throughout NHL history.

(Id. ¶ 238; see id. ¶¶ 239–68.)  Accordingly, Plaintiffs surmise, "the NHL has known for

decades that MTBI can and does lead to long-term brain injury."  (Id. ¶ 236.)

Unlike the NHL, Plaintiffs claim that "[they] had no familiarity with or reason to access any medical literature concerning concussions, [MTBI] or other sub-concussive impacts." (Id. ¶ 85.)  Rather, Plaintiffs state that they relied on the NHL for information about health and safety, and that they were never informed of the negative long-term effects of sustaining concussions.  (Id. ¶¶ 5, 8, 84, 87, 94.)  Plaintiffs assert that they "understood [the NHL's] silence as affirmation that they not only could, but should, play in a violent manner and continue to play after a head injury and that doing so posed no danger to their health."  (Id. ¶ 142.)  Plaintiffs claim that such reliance was reasonable in light of the NHL's superior position and greater resources and ability to obtain information, as well as its dependence on the players to generate revenue.  (See, e.g., id. ¶¶ 89, 93, 98–99, 135.)  Plaintiffs also claim that such reliance was foreseeable to the NHL because most of the players had limited education, and because they were "taught to trust their coaches and team personnel and League personnel who administer and run the games." (Id. ¶ 137; see, e.g., id. ¶¶ 127–38.)

Not only do Plaintiffs allege that their reliance on the NHL was both reasonable and foreseeable, but they also assert that nothing the NHL said or did put them on notice that they were at risk from the head injuries sustained while playing in the NHL.  (See id. ¶¶ 152–57.)  They claim that even the NHL's Concussion Program, created in 1997 to research and study concussions affecting NHL players between 1997 and 2004, simply concluded that "'more study is needed'" and served to conceal facts required to put Plaintiffs on notice of their claims.  (Id. ¶ 15; see id. ¶¶ 9–12, 16, 104–10, 118–19.)

Plaintiffs also allege that the NHL has downplayed the risks of head injuries and fighting and—in contrast to "[o]ther elite and professional ice hockey leagues" and other professional sports leagues—has "fostered an unreasonably and unnecessary violent League full of sheer brutality by . . . promoting fighting."  (Id. ¶ 290; see id. ¶¶ 274–89, 291–300, 332–35.)  According to Plaintiffs, the NHL glorifies this culture of violence in order to increase its profits at the box office.  (See id. ¶¶ 303–29.)

Based on these allegations, Plaintiffs assert six counts against the NHL.  (See Master Compl. ¶¶ 399–454.)  In Count I, Plaintiffs seek a declaratory judgment that the NHL knew, or reasonably should have known, that the head impacts Plaintiffs and class members endured were likely to expose them to substantially-increased risks of neurodegenerative disorders and diseases; that the NHL had a duty to advise Plaintiffs and class members of that risk, but willfully and intentionally concealed material information from, and misled, Plaintiffs concerning that risk; and that the NHL recklessly endangered Plaintiffs and class members.  (Id. ¶ 401.)  In Count II, Plaintiffs allege that, as a result of the NHL's misconduct, they have experienced injuries that have increased their risk of developing neurodegenerative disorders, and that costly medical monitoring procedures are necessary to enable Plaintiffs and class members to obtain early detection and diagnosis of those conditions.  (See id. ¶¶ 408–09, 415–16.)  Accordingly, Plaintiffs "seek the creation and funding of a Court-supervised, NHL-funded medical monitoring regime."  (Id. ¶ 417.)

Counts III and IV assert negligence-based causes of action.  In Count III, Plaintiffs allege that the NHL owed its players a duty of reasonable care to manage player safety and

to act in the best interests of its players' health and safety—including to keep players informed of the neurological risks associated with head injuries suffered while playing hockey in the NHL—and that the NHL breached that duty by, for example, promoting a culture of violence and failing to inform or warn players of the potential negative effects of such head injuries.  (Id. ¶¶ 421–24.)  Plaintiffs allege that, as a result of these breaches, they have suffered or are suffering long-term neurological damage.  (Id. ¶¶ 425–26.)  In Count IV, Plaintiffs assert a claim for negligent misrepresentation by omission.  (See id. ¶¶ 428–37.)  They allege that a special relationship existed between the NHL and Plaintiffs by virtue of the NHL's superior knowledge of material medical information that was not readily available to players and by virtue of the NHL's undertaking to communicate some safety information to players and the public, such that the NHL had a duty to disclose accurate information to Plaintiffs.  (Id. ¶ 429.)  According to Plaintiffs, the NHL breached its duty by negligently omitting material information regarding the link between the type of head injuries sustained in the NHL and cognition-impairing conditions.  (See id. ¶¶ 430, 435.)  Plaintiffs assert that they justifiably and reasonably relied to their detriment on these negligent misrepresentations by omission.  (See id. ¶¶ 432–33, 436.)

Finally, Counts V and VI assert fraud-based causes of action.  In Count V, Plaintiffs assert a claim for fraudulent concealment based on the NHL's alleged knowing concealment of material information regarding the risks of head injuries suffered while playing in the NHL, the NHL's alleged intent and expectation that Plaintiffs would rely on its silence and fraudulent concealment, and Plaintiffs' alleged reasonable reliance on that silence to their

detriment.  (See id. ¶¶ 438–45.)  And, in Count VI, Plaintiffs assert a claim for fraud by

omission and failure to warn.  (See id. ¶¶ 446–54.)  Specifically, Plaintiffs allege that "[t]he

NHL had a duty to promptly disclose and speak the full truth regarding the health risks

caused by concussion and sub-concussive blows to the head."  (Id. ¶ 447.)  Plaintiffs assert

that this duty arose by virtue of the NHL's superior knowledge of material medical

information that was not readily available to players and by virtue of the NHL's undertaking

to communicate some safety information to players and the public.  (Id.)  According to

Plaintiffs, the NHL breached this duty by fraudulently and intentionally failing to disclose

material information regarding the link between the type of head injuries sustained in the

NHL and cognition-impairing conditions, and that Plaintiffs justifiably and reasonably

relied on these fraudulent omissions to their detriment.  (See id. ¶¶ 448–51, 453.)

The NHL filed its Motion to Dismiss Master Complaint Pursuant to Federal Rules of

Civil Procedure 12(b)(6) and 9(b) on November 18, 2014.  The Motion has been fully

briefed [Doc. Nos. 46, 52, 76], and the matter was heard on January 8.

## III.    DISCUSSION

The NHL seeks dismissal of Plaintiffs' Master Complaint, or certain claims therein,

on three grounds.  First, the NHL argues that the Master Complaint must be dismissed as

time-barred.  Second, the NHL asserts that Plaintiffs' fraud-based claims must be dismissed

because they are not pled with particularity.  Third, the NHL argues that Plaintiffs' medical

monitoring claim must be dismissed because none of the relevant jurisdictions, as

determined by choice-of-law rules, recognizes medical monitoring as a stand-alone cause of

action.  The Court finds each of these arguments insufficient to warrant dismissal because:
(1) it is not clear from the face of the Master Complaint that Plaintiffs' claims are untimely;
(2) Plaintiffs' claims are adequately pled; and (3) it is not possible on the present record to
determine which jurisdictions' laws apply to Plaintiffs' medical monitoring claim.

### A.    All Claims—Statute of Limitations

When evaluating a motion to dismiss under Rule 12(b)(6), the Court assumes the
facts in the complaint to be true and construes all reasonable inferences from those facts in
the light most favorable to the plaintiff.  Morton v. Becker, 793 F.2d 185, 187 (8th Cir.
1986).  However, the Court need not accept as true wholly conclusory allegations, see
Hanten v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or legal
conclusions the plaintiff draws from the facts pled, Westcott v. City of Omaha, 901 F.2d
1486, 1488 (8th Cir. 1990).  In addition, the Court ordinarily does not consider matters
outside the pleadings on a motion to dismiss.  See Fed. R. Civ. P. 12(d).  The Court may,
however, consider exhibits attached to the complaint and documents that are necessarily
embraced by the pleadings, Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697 n.4 (8th Cir.
2003), and may also consider public records, Levy v. Ohl, 477 F.3d 988, 991 (8th Cir.
2007).

To survive a motion to dismiss, a complaint must contain "enough facts to state a
claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570
(2007).  Although a complaint need not contain "detailed factual allegations," it must
contain facts with enough specificity "to raise a right to relief above the speculative level."

Id. at 555.  "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing

Twombly, 550 U.S. at 555).  In sum, this standard "calls for enough fact[s] to raise a

reasonable expectation that discovery will reveal evidence of [the claim]."  Twombly, 550

U.S. at 556.  And, "when it 'appears from the face of the complaint itself that the limitation

period has run,' a limitations defense may properly be asserted through a Rule 12(b)(6)

motion to dismiss."  Varner v. Peterson Farms, 371 F.3d 1011, 1016 (8th Cir. 2004)

(citation omitted).

The NHL seeks dismissal of all of Plaintiffs' claims on the grounds that:  (1) the

claims are untimely because they accrued—and the applicable statutes of limitations

expired—long ago; and (2) Plaintiffs' allegations of tolling are not adequately pled.

### 1.      Accrual

The NHL first argues that the relevant statutes of limitations periods began running

on the dates on which the head injuries that Plaintiffs allegedly suffered occurred, and the

fact that those injuries may have progressed into more complicated medical conditions does

not re-start the limitations periods.  (Def.'s Mem. of Law in Supp. of Mot. to Dismiss

Master Compl. Pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) [Doc. No. 46] ("Def.'s Mem.")

at 1.)  The NHL points out that, when cases have been transferred for consolidation, the

transferee court must apply the state law of the transferor courts.  (Id. at 3 (citing In re

Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 97 F.3d 1050, 1055 (8th Cir.

1996) (citing In re Air Crash Disaster Near Chi., Ill., 644 F.2d 594, 610 (7th Cir. 1981)).)

Accordingly, the NHL argues, Minnesota law governs the statute-of-limitations analysis for claims brought by Mr. Christian and Mr. Larson, both of whom originally filed suit in the District of Minnesota, (id. at 4); District of Columbia law governs the statute-of-limitations analysis for claims brought by Mr. Leeman and Mr. Nicholls, both of whom originally brought suit in the District of Columbia, (id. at 7); and New York law governs the statute-of-limitations analysis for claims brought by Mr. LaCouture and Mr. Peluso, both of whom originally filed suit in the Southern District of New York, (id. at 8). Also according to the NHL, each of these states treats statutes of limitations as procedural matters and, therefore, applies its own statute of limitations to substantive claims. (See id. at 4, 7, 8.)

Plaintiffs, on the other hand, argue that the injuries at issue are not the discrete head injuries they suffered while playing in the NHL, but rather are the increased risk and development of permanent degenerative brain diseases that resulted from the repeated head injuries and "which arose and of which Plaintiffs became aware only after Plaintiffs retired from the NHL." (Pls.' Mem. of Law in Opp. to Def.'s Mot. to Dismiss Master Compl. Pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) [Doc. No. 52] ("Pls.' Opp.") at 9; see id. at 7.) Plaintiffs assert that there is a "fundamental dispute" about the NHL's and the players' knowledge of the risks and the link to the players' damages, rendering the question of whether the relevant limitations period has run a fact question that cannot be resolved on a motion to dismiss. (See id. at 7–9.)

The Court agrees with Plaintiffs. "Under Minnesota law, a plaintiff must file suit for personal injuries on claims of negligence, fraud, [and] misrepresentation . . . within six years

after the claim accrues." <u>Klempka v. G.D. Searle & Co.</u>, 963 F.2d 168, 170 (8th Cir. 1992) (citing Minn. Stat. § 541.05).  Although, "[a]s a general rule, the cause of action accrues when the accident occurs," the Minnesota Supreme Court has held that "[a]n action for negligence cannot be maintained, nor does the statute of limitations begin to run, until damage has resulted from the alleged negligence." <u>Dalton v. Dow Chem. Co.</u>, 158 N.W.2d 580, 583–84 (Minn. 1968) (citations omitted).  And, "for relief on the ground of fraud, . . . the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." Minn. Stat. § 541.05, Subd. 1(6).

Similarly, under District of Columbia law, the limitations period for claims of negligence and fraudulent and negligent misrepresentation is three years. <u>See</u> <u>Drake v. McNair</u>, 993 A.2d 607, 617 (D.C. 2010) (citing D.C. Code § 12-301(8)) (fraudulent and negligent misrepresentation); <u>Casey v. Ward</u>, --- F. Supp. 3d ---, Civ. Case No. 13-01452 (RJL), 2014 WL 4387216, at *5 (D.D.C. Sept. 5, 2014) (negligence).  Again, although a cause of action generally accrues at the time the injury occurs, "in cases where the relationship between the fact of injury and the tortious conduct is obscure, District of Columbia law provides for the application of a discovery rule and the statute of limitations will not run until plaintiff knows or reasonably should know that an injury has been suffered due to the defendant's wrongdoing." <u>Lee v. Wolfson</u>, 265 F. Supp. 2d 14, 17 (D.D.C. 2003) (citations omitted).  More specifically, "the plaintiff [must] ha[ve] knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury,

(2) its cause in fact, and (3) some evidence of wrongdoing." Id. (citation and internal quotation marks omitted).

Finally, "[u]nder New York law, personal injury tort claims must be commenced within three years." Fisher v. APP Pharms., LLC, 783 F. Supp. 2d 424, 429 (S.D.N.Y. 2011) (finding that, although a fraudulent concealment claim would ordinarily be subject to a six-year statute of limitations, it is subject to a three-year statute of limitations where it is "merely incidental to [a] negligence claim"). "As a general rule, . . . 'the date of injury is the benchmark for determining the accrual of a cause of action.'" In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., No. 00 MDL 1898 (SAS), 2009 WL 2634749, at *2 (S.D.N.Y. Aug. 25, 2009) (quoting Blanco v. Am. Tel. & Tel. Co., 689 N.E.2d 506, 510 (N.Y. 1997)).

Assuming for purposes of this Motion that the NHL has correctly identified which states' statutes of limitations apply to Plaintiffs' claims, it is not clear from the face of the Master Complaint that those limitations periods have run. For example, Plaintiffs have alleged injuries in the form of "an increased risk of developing serious latent neurodegenerative disorders and diseases including but not limited to CTE, dementia, Alzheimer's disease or similar cognitive-impairing conditions," (Master Compl. ¶¶ 402, 425; see id. ¶¶ 38, 50, 56–57, 65, 72, 83, 425, 436, 444, 453); and "latent or manifest neuro-degenerative disorders and diseases," (id. ¶ 18). They have further alleged that, for example, "CTE is caused by repeated sublethal brain trauma of the sort Plaintiffs repeatedly suffered," (id. ¶ 210), including sub-concussive impacts that are not diagnosed as

13

concussions and which are sustained by the thousands by NHL players each year, (id. ¶¶ 216–17, 220); and that "brain injury and brain disease in NHL retirees is a latent disease that can appear years or decades after the player experiences head trauma in his NHL career," (id. ¶ 407).  Thus, when such injuries "occurred" or "resulted" are matters that cannot be determined from the face of the Master Complaint and are proper subjects of discovery.

In addition, Plaintiffs have alleged that they "did not know and had no reason to know, that continuing to practice and play after concussions and other head hits substantially increased the risks of the occurrence, and severity, of the serious neurological symptoms and illnesses," (id. ¶ 91); that they "had no familiarity with or reason to access any medical literature concerning concussions, mild traumatic brain injuries or other sub-concussive impacts," (id. ¶ 85); and that, "[n]ever having been advised [by the NHL] about the negative, long-term effects of sustaining concussions, . . . Plaintiffs were never on notice that they needed to try to find, and understand, such information," (id. ¶ 86).  Accordingly, when Plaintiffs discovered or should have discovered the link between the type of head injuries they suffered and the increased risk of developing neurodegenerative disorders, or when Plaintiffs had knowledge or should have had knowledge of the NHL's alleged wrongful actions, are also matters that cannot be determined from the face of the Master Complaint and are proper subjects of discovery.

The NHL's main argument to the contrary is that "a plaintiff's claim accrues when he or she is aware of the 'possibility' of injury, even though he or she may not be aware of

14

the full extent of the injury." (Def.'s Mem. at 5.) The NHL cites several cases in support of this proposition, including <u>Klempka v. G.D. Searle & Co.</u>, in which the Eighth Circuit—applying Minnesota law—stated that "[a] plaintiff who is aware of both her injury and the likely cause of her injury is not permitted to circumvent the statute of limitations by waiting for a more serious injury to develop from the same cause." 963 F.2d at 170. (<u>See</u> Def.'s Mem. at 5; Def.'s Reply in Supp. of Mot. to Dismiss Master Compl. Pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) [Doc. No. 76] ("Def.'s Reply") at 3–5.) The NHL argues that, under these cases, the statutes of limitations began to run on Plaintiffs' claims when Plaintiffs sustained head injuries in the NHL because they were aware at that time that they had been injured, (<u>see</u> Def.'s Mem. at 5), and the fact that the injuries are now "more extensive than they realized at the time they sustained them does not extend the limitations period," (<u>id.</u> at 6).

As discussed above, however, Plaintiffs have alleged injury in the form of an increased risk of developing neurodegenerative diseases, which is caused by repeated sublethal brain trauma, including sub-concussive impacts that are not diagnosed as concussions. Thus, Plaintiffs have plausibly alleged that they may not have been aware that they had suffered an injury—or the possibility of injury—while they were playing in the NHL. Accordingly, because it cannot be determined from the face of the Master Complaint when Plaintiffs' causes of action accrued, the NHL's Motion must be denied.

### 2.    Equitable tolling

The NHL next argues that Plaintiffs' allegations of entitlement to equitable tolling on the basis of the NHL's fraudulent concealment of the dangers of concussions, sub-concussive impacts, and head trauma are insufficient because:  (1) Plaintiffs do not claim that the NHL concealed information related to Plaintiffs' initial concussive or sub-concussive injuries, (Def.'s Mem. at 13; Def.'s Reply at 6–7); and (2) Plaintiffs cite to "widely published" scientific studies, "infamous incidents" of head trauma incurred by former NHL players, and news articles about concussions in the NHL, all of which are publicly available and should have put Plaintiffs on notice of their claims, (Def.'s Mem. at 14–17; Def.'s Reply at 7–9).

The NHL raises these same arguments in challenging the sufficiency of Plaintiffs' allegations in their claim for fraudulent concealment and, as discussed in more detail below, the Court finds that Plaintiffs have sufficiently alleged that the NHL took affirmative actions to conceal the dangers of concussions, sub-concussive impacts, and head trauma; that the NHL was silent when confronted with a duty to disclose such information; and that the fact that some information is publicly available does not foreclose a finding of concealment. Accordingly, the NHL's Motion also must be denied at this stage of the proceedings because Plaintiffs have alleged facts which, construed in a light most favorable to Plaintiffs, warrant equitable tolling based on the doctrine of fraudulent concealment.

## B.     Fraud-Based Claims—Failure to Plead with Particularity

The NHL also seeks dismissal of Counts IV (negligent misrepresentation by omission), V (fraudulent concealment), and VI (fraud by omission/failure to warn) of the Master Complaint under Rule 9(b) of the Federal Rules of Civil Procedure.  Rule 9(b) mandates a heightened pleading standard with respect to fraud-based claims.  See Drobnak v. Andersen Corp., 561 F.3d 778, 783–84 (8th Cir. 2009) (applying Federal Rule of Civil Procedure 9(b)'s heightened pleading standard to fraud-based claims brought under state law).  Negligent misrepresentation by omission, fraudulent concealment, and fraud by omission are such claims, see Trooien v. Mansour, 608 F.3d 1020, 1028 (8th Cir. 2010), and, accordingly, must be pled "with particularity," Fed. R. Civ. P. 9(b).

In order to satisfy Rule 9(b)'s particularity requirement, "the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result."  United States ex rel. Thayer v. Planned Parenthood of the Heartland, 765 F.3d 914, 916–17 (8th Cir. 2014) (citation and internal quotation marks omitted).  "In other words, the complaint must identify the who, what, where, when, and how of the alleged fraud."  Id. at 917 (citation and internal quotation marks omitted).  However, "Rule 9(b) does not require that the exact particulars of every instance of fraud be alleged, so long as the complaint includes enough detail to inform the defendant of the core factual basis of the fraud claims."  Ransom v. VFS, Inc., 918 F. Supp. 2d 888, 898 (D. Minn. 2013) (citation and internal quotation marks omitted).

17

In determining whether allegations of fraud are sufficiently pled, the Court should consider the complaint as a whole.  See Evangelical Lutheran Church in Am. Bd. of Pensions v. Spherion Pac. Workforce LLC, No. 04-4791 (ADM/AJB), 2005 WL 1041487, at *3 (D. Minn. May 4, 2005) (finding that a claim of negligent misrepresentation survived where the complaint, "analyzed as a whole, adequately put[] [the defendant] on notice of the particular instances of misrepresentation claimed by [the plaintiff]").

### 1.      Negligent misrepresentation by omission and fraud by omission/failure to warn

The NHL argues that Plaintiffs have insufficiently pled that the NHL owed them a duty to disclose the allegedly omitted information.  (Def.'s Mem. at 20.)  The NHL also argues that Plaintiffs have failed to adequately plead the circumstances regarding the alleged omissions.  (Id.)  Both arguments fail.

### a.      Duty to disclose

The NHL first argues that, in order to state a claim for negligent misrepresentation by omission or fraud by omission, Plaintiffs must plead that the NHL owed them a duty to disclose the allegedly omitted information, and that Plaintiffs failed to sufficiently plead either that the NHL had superior knowledge of material medical information to which NHL players did not have access, or that the NHL made partial disclosures that omitted material information.  (Id. at 20–22 (citing Master Compl. ¶¶ 429, 447).)

### i.      Superior knowledge

The NHL argues that no duty to disclose can arise when the information of which it allegedly had superior knowledge was publicly available.  (See id. at 22–23.)  The Court is

not persuaded by this argument.  First, as demonstrated even by the authority relied upon by

the NHL, Plaintiffs—at this stage of the litigation—need only have alleged facts, which

taken as true, demonstrate the existence of some material information known by the NHL

and to which Plaintiffs did not have access.  See Wolph v. Acer Am. Corp., No. C 09-01314

JSW, 2009 WL 2969467, at *4 (N.D. Cal. Sept. 14, 2009) (granting the defendant's motion

to dismiss the plaintiff's claim for fraud by omission where "[the plaintiffs] ha[d] not

alleged any information known by [the defendant] that was unavailable to the public")

(emphasis added)[1]; see also Falk v. Gen. Motors Corp., 496 F. Supp. 2d 1088, 1096–97

(N.D. Cal. 2007) (finding allegations that only General Motors had access to certain testing

and dealer data were sufficient to state a claim that General Motors had exclusive

knowledge of its product's defect, even though consumer complaints were available online,

because "[General Motors] [was] alleged to have known a lot more about the defective

[product], including information unavailable to the public") (emphasis omitted).  And,

---

[1]      The other cases relied upon by the NHL are distinguishable.  In Kellogg Square
P'ship v. Prudential Insurance Co. of America, the plaintiff brought a claim for fraudulent
misrepresentation based on the defendant's alleged failure to disclose the existence of
asbestos in a building it sold to the plaintiff.  63 F.3d 699, 700 (8th Cir. 1995).  The Eighth
Circuit affirmed the district court's grant of summary judgment against the plaintiff because,
"as a sophisticated real estate investor, [the plaintiff] had access to the same public
information and government regulation which . . . put [the defendant] on notice that
asbestos was a hazardous material."  Id. at 702.  Similarly, in American Bank of St. Paul v.
TD Bank, N.A., the district court granted summary judgment in favor of the defendant on
the plaintiff's fraud by omission claim because the allegedly omitted information "was
'readily ascertainable' to the other participating banks" in the commercial transaction.  Civ.
No. 09-2240 (ADM/TNL), 2011 WL 1810643, at *5 (D. Minn. May 9, 2011).  In particular,
the information was accessible "through routine searches of public records."  Id. at *4.
Thus, unlike the procedural posture and parties in the present matter, both Kellogg Square
and American Bank arose in the context of a summary judgment motion and involved
sophisticated parties conducting commercial transactions.

Plaintiffs have satisfied that standard by alleging, for example, that:  (1) "[t]he [NHL] regularly collects game injury reports, becoming the repository of substantial concussion and other head injury information," (Master Compl. ¶ 145); (2) "the players lacked the injury data that the NHL receives from every team after every game," (id. ¶ 340); (3) "[t]he NHL . . . collect[s] and analyze[s] concussion and head injury data—cause, effect, type, severity, location, and other specific factors—treatment options and related information," (id. ¶ 347); and (4) "the NHL received and paid for advice from medical consultants regarding health risks associated with playing hockey, including the health risks associated with concussive and sub-concussive injuries," (id. ¶ 353).

### ii.       Partial or ambiguous disclosures

The NHL also argues that Plaintiffs have failed to identify the allegedly partial or ambiguous communications or the "who," "what," "when," and "why" details of those communications.  (See Def.'s Mem. at 23–24.)  The Court disagrees.  As for identification of the allegedly partial or ambiguous communications, Plaintiffs alleged that:  "[the] NHL effectively said [that] 'concussions are just dings, or a little bell ringing' and 'it's okay to go right back out on the ice after sustaining one,'" (Master Compl. ¶ 100); "when at long last the NHL finally disclosed the Concussion Program report, it said nothing about MTBI and simply stated that 'more study is needed,'" (id. ¶ 109); "Commissioner Bettman said of fighting [that] '[m]aybe it is [dangerous] and maybe it's not,'" (id. ¶ 335); and "Deputy Commissioner Daly has publicly stated, '[The NHL is] completely satisfied with the responsible manner in which the league and the players' association have managed player

safety over time, including with respect to head injuries and concussions. . . . This is

something that we have always treated as important and will continue to treat as

important,'" (id. ¶ 345).  Moreover, as discussed in the following subsection, Plaintiffs have

adequately pled the circumstances in which the communications (which were allegedly

negligent or fraudulent because of the information they omitted) were made.[2]

### b.      Circumstances of omissions

The NHL contends that Plaintiffs' omission claims fail because Plaintiffs did not

plead:  "the precise content of information that was omitted; the identity of any individual

who omitted material information; when the omitted information should have been

disclosed; or how plaintiffs were misled."  (Def.'s Mem. at 26.)  In other words, Defendant

challenges Plaintiffs' allegations with respect to the "what," "who," "when," and "how" of

the alleged omissions.

Judges in this District have repeatedly noted that concealment and omission cases are

inherently difficult to plead with particularity because they involve events that did not occur,

see, e.g., Sanford v. Maid-Rite Corp., No. Civ. 13-2250 (MJD/LIB), 2014 WL 1608301, at

---

[2]      Briefly stated, Plaintiffs identify NHL Commissioner Gary Bettman and NHL medical doctors, supervisors, doctors, and trainers as "who" made the statements.  (See Master Compl. ¶¶ 16, 127.)  (These particular allegations also identify Mr. Daly and the authors of the Concussion Program report.)  As for "what," Plaintiffs allege that the NHL failed to disclose the dangers and risks of repeated head trauma and the dangers of returning to play or practice hockey until proper evaluation and treatment has been administered.  (See id. ¶¶ 5, 101, 134, 143.)  As for "when," Plaintiffs allege that omissions occurred when the NHL issued the Concussion Program report and when the players were returned to play after suffering concussions or head hits.  (See id. ¶¶ 15, 96, 345.)  As for "why," Plaintiffs allege that the NHL engaged in its "long-running course of fraudulent and negligent conduct to maintain and improve its economic advantage."  (Id. ¶ 357.)

*12 (D. Minn. Apr. 21, 2014) (citation omitted), and, thus, the "who, what, where, when, and how" requirement is not as stringent for such claims, see In re Target Corp. Customer Data Sec. Breach Litig., --- F. Supp. 3d ---, MDL No. 14-2522 (PAM/JJK), 2014 WL 6775314, at *5 (D. Minn. Dec. 2, 2014) (citation and internal quotation marks omitted) (stating that, under Rule 9(b), it is sufficient for a plaintiff to identify the omitted information and "how or when" the concealment or omission occurred); In re Hardieplank Fiber Cement Siding Litig., No. 12-md-2359, 2013 WL 3717743, at *7 (D. Minn. July 15, 2013) ("[Plaintiffs] also allege . . . fraudulent omissions, which, by their very definition would not require Plaintiffs to plead a specific time or place.") (citing In re Whirlpool Corp. Front–Loading Washer, 684 F. Supp. 2d 942, 961 (N.D. Ohio 2009)).  Nevertheless, the Court finds that Plaintiffs have adequately pled each of the challenged aspects of the alleged omissions with sufficient particularity.

As for "what," Plaintiffs point to, among others, the following paragraphs of the Master Complaint:

> 5.  Although the NHL knew or should have known, as the Plaintiffs did not, about this scientific evidence concerning concussions, sub-concussive impacts and brain injuries, the NHL never told Plaintiffs about the dangers of repeated brain trauma.
>
> . . .
>
> 101.  Plaintiffs reasonably acted on what the NHL omitted—that concussions and subconcussive hits are a big deal, and you should not go back to play or practice until you have been properly evaluated, treated and cleared to play because the risks of permanent damage are enormous—in returning to play immediately after taking brutal hits to the head, even after getting knocked out cold and being revived with smelling salts.

. . .

134.  . . . [T]he NHL never told its players <u>that these [boxing, football and]</u> <u>other studies demonstrate an increased risk for NHL players, or had any</u> <u>implications for NHL players</u>.

. . .

143.  At no time, including during the seven year Concussion Program and in the following seven year silence before publishing the Program's report, did the NHL warn players <u>that the data suggested at a minimum that greater</u> <u>attention to concussions and head injuries was necessary, that it was possible</u> <u>that playing in the same game, or soon after, a head injury was potentially</u> <u>dangerous</u>, or any other such warning.

(Master Compl. ¶¶ 5, 101, 134, 143 (emphases added); <u>see</u> Pls.' Opp. at 33 (citing Master Compl. ¶¶ 5, 101, 117–19, 134, 143).)  The Court finds that Plaintiffs have adequately alleged that the NHL negligently or fraudulently omitted information about the dangers and risks of repeated head trauma, the dangers of returning to play or practice hockey until proper evaluation and treatment has been administered, and the data that demonstrated the existence of such dangers and risks.

As for "who," Plaintiffs rely on, for example, the following paragraphs:

16.  Despite the mountain of evidence connecting hockey to brain injuries, <u>NHL Commissioner Gary Bettman</u> subsequently stated that more study on the issue is necessary. . . .

. . .

84.  At no time during his NHL career did any <u>NHL personnel</u> advise these players, generally or specifically, of the negative long-term effects of sustaining concussions and sub-concussive blows to the head, including the risks of repeat concussions and sub-concussive blows.

. . .

23

122.  [Brian] Benson, with Jian Kang, "contributed to the drafting of the [Concussion Program's report] manuscript."

. . .

127.  Hockey players, no differently from anyone else, grow up believing that medical personnel, such as League medical directors, supervisors, doctors and trainers, put the patient-players' interests first and foremost.  Cleared to play immediately after getting knocked out[,] . . . players believed they were, in fact, "good to go" and not doing any lasting harm to themselves[.]

. . .

310.  In a 1989 interview with The Wall Street Journal, [then-NHL President John] Ziegler went on to explain why he would not put an end to fighting in the NHL:  . . . .  The main question about fighting is, "Does the customer accept it?"  The answer, at present, seems to be yes.

(Master Compl. ¶¶ 16, 84, 122, 127, 310 (emphases added); see Pls.' Opp. at 33–34 (citing Master Compl. ¶¶ 16, 84, 120–22, 127, 269, 310–12, 333).)  The Court finds that Plaintiffs have adequately alleged that Mr. Bettman, the authors of the Concussion Program report, Mr. Ziegler, and NHL medical doctors, supervisors, doctors, and trainers[3] negligently or fraudulently omitted the information discussed above.

---

[3]     The NHL argues that "NHL personnel" and "NHL medical personnel" are "sweeping allegations" that do not satisfy Rule 9(b), but the NHL cites no authority to support its argument.  (See Def.'s Reply at 14.)  And, on the contrary, the failure to provide names of alleged wrongdoers is not dispositive, so long as Plaintiffs have alleged sufficient facts from which the NHL can readily identify the accused individuals.  See Stumm v. BAC Home Loans Servicing, LP, 914 F. Supp. 2d 1009, 1013–14 (D. Minn. 2012) ("The failure to provide the name of an employee who made an allegedly fraudulent statement is not necessarily fatal, as long as the complaint pleads sufficient facts to allow the employer readily to identify the employee who spoke to the plaintiff.").  While the terms "NHL personnel" and "NHL medical personnel" are broad, Plaintiffs go on to define "personnel" as "[NHL] medical directors, supervisors, doctors, and trainers."  The NHL should be able to readily identify its medical directors, supervisors, doctors, and trainers.

As for "when," Plaintiffs refer to the following paragraphs:

15. . . . . [T]he Concussion Program did nothing until 2011—fourteen years after it started—when it finally issued a report.  That report, however, discussed only the number of concussions in the NHL for the regular seasons from 1997-2004.  Listing nine specific study limitations, the report, fourteen years in the making, boiled down to a "more study is needed dodge."

. . .

96.  Had the NHL given Plaintiffs information about the increased danger to which they subjected themselves by continuing to play after concussions and head hits, or at least told players that such information existed, Plaintiffs would have ensured that they received appropriate medical treatment and made sure they had recovered before returning to practices and games.

. . .

345.  . . . . The NHL has admitted that it has "always" assumed the duty to care for player safety.  Deputy Commissioner Daly has publicly stated, "[The NHL is] completely satisfied with the responsible manner in which the league and the players' association have managed player safety over time, including with respect to head injuries and concussions. . . . This is something that we have always treated as important and will continue to treat as important."

(Master Compl. ¶¶ 15, 96, 345 (emphases added); see Pls.' Opp. at 34 (citing Master Compl. ¶¶ 15, 95–96, 333, 345).)  The Court finds that Plaintiffs have adequately alleged that the NHL negligently or fraudulently omitted information on an ongoing basis, but in particular when it issued the Concussion Program report and when the players were returned to play after suffering concussions or head hits.[4]

---

[4]    The NHL argues that "always" and "every time a player was being evaluated to return . . . after a concussion" are "sweeping allegations" that do not satisfy Rule 9(b).  (See Def.'s Reply at 14.)  Defendant again cites no authority to support its argument and, as noted above, in omission cases a plaintiff need not allege a specific time.  See In re Hardieplank Fiber Cement Siding Litig., 2013 WL 3717743, at *7 (citing In re Whirlpool Corp. Front–Loading Washer, 684 F. Supp. 2d at 961).

Finally, as for "how," Plaintiffs point to these paragraphs:

12.   . . . . Yet the NHL <u>took no action</u> to reduce the number and severity of concussions among its players during [the study period of the Concussion Program] and Plaintiffs relied on the NHL's silence to their detriment.

. . .

96.   Had the NHL given Plaintiffs information about the increased danger to which they subjected themselves by continuing to play after concussions and head hits, or at least told players that such information existed, <u>Plaintiffs would have ensured that they received appropriate medical treatment and made sure they had recovered before returning to practices and games</u>.

. . .

100.   Plaintiffs reasonably relied on what [the] NHL effectively said— "concussions are just 'dings,'" or 'a little bell ringing" and "<u>it's okay to go right back out on the ice after sustaining one</u>."

. . .

124.   Even today, the League's stock response to concussion questions boils down to:   "We need more data, more research, we cannot say anything conclusive." . . . [T]hat response confirms the NHL's unwavering <u>failure to say or do anything that would have put Plaintiffs on notice that they should investigate claims</u>.

. . .

136.   In <u>refusing for decades to properly diagnose and treat concussions suffered by its players</u>, the NHL misled Plaintiffs into believing that returning quickly to play, often in the same game in which they were concussed or otherwise "had their bells rung," was safe, posing neither short-term nor long-term dangers of brain injury and neuro-cognitive impairment.

. . .

344.   In a number of ways <u>the NHL communicated to the players that they were not at risk of long-term brain and neuro-cognitive injury from concussion and other head injuries</u>.   These include, for example:

(a)  promoting fighting . . . ;

(b)  having players continue their careers even after inflicting career-ending concussive damage to competitors . . . ;

(c)  calibrating player discipline for head hits to the existence and severity of resulting injury . . . ;

(d)  returning players to play in games in which they had been concussed, even knocked cold . . . ;

(e)  returning players to play after concussive and other head injuries without any medical evaluation or subsequent waiting period;

(f)  by never warning the players that they might be developing CTE and should be checked for symptoms to ensure that they understood that continued playing might expose them to irreversible brain damage and neuro-cognitive impairment;

(g)  by never warning the players that studies of football players and boxers, and others, . . . were applicable to NHL players;

(h)  by avoiding any proper study of concussions and other head injuries and developing rules and protocols for disclosing risks and minimizing their occurrence.

. . .

361.   Delaying for some seven years the publication of a report from the Concussion Program that did not mention MTBI and was designed to ignore accepted and valid neuroscience regarding the connection between repetitive traumatic concussive events, sub-concussive events and/or brain injuries, and degenerative brain disease such as CTE, only confirmed and reinforced a climate of silence by which the NHL implied, and Plaintiffs reasonably relied on the implication, that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

(Master Compl. ¶¶ 12, 100, 124, 136, 344, 361 (emphases added); see Pls.' Opp. at 34

(citing Master Compl. ¶¶ 12, 15, 96, 100, 124, 136, 269, 344, 361).)  The Court finds that

Plaintiffs have adequately alleged that the NHL negligently or fraudulently omitted

information by not taking action, signaling to players that it was alright to return to play after suffering a head injury, not properly diagnosing and treating concussions suffered by players, and implying that players were not at risk for long-term effects of their injuries and that the scientific information related to the subject was inconclusive.  Accordingly, when Plaintiffs' Master Complaint is viewed as a whole, Plaintiffs' claims for negligent misrepresentation by omission and fraud by omission satisfy Rule 9(b).

## 2.    Fraudulent concealment

The NHL next argues that Plaintiffs' claim for fraudulent concealment is insufficiently pled because Plaintiffs did not allege that the NHL deliberately concealed information, or allege such concealment with particularity.  (Def.'s Mem. at 26.)  Specifically, the NHL asserts that Plaintiffs could not allege the NHL's deliberate concealment of material information because the alleged material facts were public information, that Plaintiffs failed to allege an affirmative act of concealment (including that the NHL's personnel made any statements about the seriousness of the head injuries or about the Concussion Program report that addressed the long-term risks of head injuries), and that Plaintiffs make no attempt in their fraudulent concealment claim—unlike in their negligent misrepresentation by omission and fraud by omission claims—to allege that the NHL even owed Plaintiffs a duty.  (See id. at 27; Def.'s Reply at 15.)

In opposition, Plaintiffs argue that they properly alleged that the NHL concealed information about long-term neurodegenerative risks in the face of a duty to disclose (as discussed above).  (Pls.' Opp. at 35.)  Plaintiffs also assert that whether the concealed

information was public is of no import because Plaintiffs justifiably relied on the NHL's

guidance, and the NHL took action intended to deter Plaintiffs' inquiry into the matter.  (See

id. at 36.)  Finally, Plaintiffs argue that they were not required to re-plead the existence of a

duty to disclose in Count V because they had already pled it in Count IV and had

incorporated those paragraphs by reference into Count V.  (See id. at 36–37 (citing Master

Compl. ¶¶ 429, 438).)

        The Court finds that Plaintiffs have adequately pled their fraudulent concealment

claim.  First, as Plaintiffs have argued, the fact that some information is publicly available

does not foreclose relief on omission or concealment claims.  See Wolph, 2009 WL

2969467, at *4; Falk, 496 F. Supp. 2d at 1096–97; see also Diaz v. First Am. Home Buyers

Prot. Corp., 541 F. App'x 773, 775 (9th Cir. 2013) (citing Vega v. Jones, Day, Reavis &

Pogue, 17 Cal. Rptr. 3d 26, 35 (Cal. Ct. App. 2004) ("[T]he contention that publicly

available information cannot form the basis for a concealment claim is mistaken.  The mere

fact that information exists somewhere in the public domain is by no means conclusive."));

Grozdanich v. Leisure Hills Health Ctr., Inc., 25 F. Supp. 2d 953, 991 (D. Minn. 1998)

(citing City of Coon Rapids v. Suburban Eng'g, Inc., 167 N.W.2d 493, 496 (Minn. 1969))

("In this jurisdiction, a party is justified in relying upon a false representation, even though

he or she might have learned of its falsity upon investigation, unless the falsity is obvious.").

This is especially true where, as here, it is alleged that Plaintiffs justifiably relied on the

NHL's guidance, and the NHL took action intended to deter Plaintiffs' inquiry into the

matter.  See Inacom Corp. v. Sears, Roebuck & Co., 254 F.3d 683, 690–91 (8th Cir. 2001)

(upholding a jury verdict on a fraudulent concealment claim where the evidence demonstrated that the defendant had a duty to disclose certain material information to the plaintiff, the defendant prevented the plaintiff from readily uncovering the concealed information, and the plaintiff relied upon the "less than candid conduct").

Second, the parties agree that a required element of a claim for fraudulent concealment is that a defendant deliberately concealed a material fact or was silent in the face of a duty to speak.  (See id. at 26–27 & n.12 (citing Trs. of Twin City Bricklayers Fringe Benefit Funds v. Superior Waterproofing, Inc., 450 F.3d 324, 331 (8th Cir. 2006); Qwest Commc'ns Co. v. Free Conferencing Corp., 990 F. Supp. 2d 953, 976 (D. Minn. 2014)); Pls.' Opp. at 35 (citing In re Temporomandibular (TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1497 (8th Cir. 1997)).)  Therefore, although the Court finds that Plaintiffs included several allegations of the NHL's affirmative acts to conceal (see paragraphs 100, 124, 136, and 344, quoted above), Plaintiffs' allegations of silence when confronted with a duty to speak (as discussed in Part III.B.1.a.) are also sufficient.

Finally, Plaintiffs do allege that the NHL had a duty to disclose the allegedly concealed information, most notably in Count IV:  "A special relationship exists between the NHL and the Plaintiffs sufficient to impose a duty on the NHL to disclose accurate information to the Plaintiffs."  (Master Compl. ¶ 429.)  And, Plaintiffs incorporated the paragraphs delineating Count IV by reference into Count V, (see id. ¶ 438), as permitted under Rule 10(c) of the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading . . . .").

Accordingly, when read as a whole, the Master Complaint adequately states a claim for fraudulent concealment.[5]

### C.   Medical Monitoring

Finally, the NHL argues that Plaintiffs' medical monitoring claim must be dismissed because the law of the state in which each Plaintiff is domiciled governs that claim, and none of the applicable jurisdictions as determined by the relevant choice-of-law analyses recognizes medical monitoring as an independent claim.  (See Def.'s Mem. at 30–33.)  In response, Plaintiffs argue that a fact-specific choice-of-law analysis is more appropriately conducted at the class certification stage, but that even if medical monitoring is not considered to be an independent cause of action in a given jurisdiction, it is still available to Plaintiffs—and was adequately pled—as a form of relief.  (See Pls.' Opp. at 39–53.)

The Court agrees with Plaintiffs that it is premature at this stage of these proceedings to conduct a choice-of-law analysis.  As discussed above, when cases have been transferred for consolidation, the transferee court must apply the state law of the transferor courts, including those states' choice-of-law principles.  See In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 97 F.3d at 1055 (citing In re Air Crash Disaster Near Chi., Ill., 644 F.2d at 610).  In this case, that rule would require application of the choice-of-law principles of Minnesota, New York, and the District of Columbia.

---

[5]      The NHL argues that, even if the Court determines that complete dismissal of Plaintiffs' fraud-based claims is inappropriate under Rule 9(b), Plaintiffs should still be required to provide a more definite statement of those claims pursuant to Rule 12(e).  The Court declines to address this argument because it finds that Plaintiffs have adequately pled their fraud-based claims in the current version of the Master Complaint.

Under Minnesota's choice-of-law rules, a court must first determine "whether the choice of one state's law over another's creates an actual conflict." Jepson v. Gen. Cas. Co. of Wis., 513 N.W.2d 467, 469 (Minn. 1994) (citation omitted).  If an actual conflict exists, the court must next consider whether the laws can be constitutionally applied.  See id.  For application of a state's law to be permissible, "'that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.'"  Id. at 469–70 (quoting Allstate Ins. Co. v. Hague, 449 U.S. 302, 312–13 (1981)).  If the laws may be constitutionally applied, the court then considers five factors in determining which one to apply:  "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law."  Id. at 470 (citation omitted).

Under New York's choice-of-law principles, a court must first determine whether there is an actual conflict between the laws at issue.  In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013) (citation omitted).  If a conflict exists, and the underlying action involves a tort claim, New York's "interest-analysis test" applies.  Id.  Under this test, the court must determine which jurisdiction has the greatest interest in the litigation, considering only the facts or contacts "'which relate to the purpose of the particular law in conflict.'"  Id. (quoting Schultz v. Boy Scouts of Am., Inc., 480 N.E.2d 679, 684 (N.Y. 1985)).  "'[T]he significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort.'"  Id. at 219–20 (quoting Schultz, 480 N.E.2d at 684).

Finally, under the District of Columbia's choice-of-law rules, a court must apply a

"'governmental interests' analysis" to determine which state's law to apply to an underlying

tort action. <u>Kaiser-Georgetown Cmty. Health Plan, Inc. v. Stutsman</u>, 491 A.2d 502, 509

(D.C. 1985) (citations omitted).  Under this analysis, the court must "evaluate the

governmental policies underlying the applicable laws and . . . determine which jurisdiction's

policy would be most advanced by having its law applied." <u>Id.</u> (citation and internal

quotation marks omitted).

Without discovery and a fuller record, it is not possible for the Court to conduct these

fact-intensive inquiries to evaluate which states' laws should apply to Plaintiffs' medical

monitoring claim.  And, because a proper choice-of-law analysis may result in application

of the law of a state in which medical monitoring is recognized as an independent claim, the

Court declines to address Plaintiffs' argument that they may at least rely on medical

monitoring as a form of relief.  Accordingly, the NHL's Motion must be denied in this

regard at this stage of the litigation.

## IV.   ORDER

Based on all the files, records and proceedings herein, **IT IS HEREBY ORDERED**

**THAT** Defendant's Motion to Dismiss Master Complaint Pursuant to Federal Rules of

Civil Procedure 12(b)(6) and 9(b) [Doc. No. 43] is **DENIED IN PART AND DENIED**

**WITHOUT PREJUDICE IN PART**, as detailed herein.

Dated:  March 25, 2015                    s/Susan Richard Nelson
                                          SUSAN RICHARD NELSON
                                          United States District Judge

33